UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-62037-CIV-COHN-SELTZER

EDWARD BURGER, AS TRUSTEE
OF THE 2009 HUBBARD FAMILY
TRUST, a New Mexico trust,
PRAEFECTUS CAPITAL, LLC,
a South Dakota limited liability
company, ALBERT ANGELO, JR.,
CRAIG ANGELO, ROBERT
MASTERSON, DAN MEADOWS,
and JERRY BAYLES,

       Plaintiffs,

v.

JOHN HARTLEY, JOHN A.
MATTERA, BRADFORD
VAN SICLEN, JOHN RAY
ARNOLD, PRAETORIAN G.
POWER II, LLC, a Delaware
limited liability company,
G. POWER II, a Delaware
corporation, FIRST AMERICAN
SERVICE TRANSMITTALS, INC.,
a Florida corporation, and PRAETORIAN
FUND, LTD., a British Virgin Islands
Corporation.

       Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, Edward Burger, as Trustee of The 2009 Hubbard Family Trust, a New

Mexico trust ("Trust"), Praefectus Capital, LLC, a South Dakota limited liability company

("Praefectus"), Albert Angelo, Jr., Craig Angelo, Robert Masterson, Dan Meadows, and

Jerry Bayles (collectively "Investors"), sue Defendants, John Hartley ("Hartley"), John A.

Mattera ("Mattera"), Bradford van Siclen ("van Siclen"), John Ray Arnold ("Arnold"), John Hartley ("Hartley"), Praetorian G. Power II, LLC, a Delaware limited liability company ("Praetorian"), G. Power II, a Delaware corporation ("G. Power"), First American Service Transmittals, Inc. ("First American"), a Florida corporation, and Praetorian Fund ("Fund"), a British Virgin Islands corporation, and allege as follows:

## INTRODUCTION

1.     This is an action under Section 10(b) of the Securities and Exchange Act of 1934 for rescission, and alternatively, to recover substantial damages caused by Defendants' Praetorian, G. Power, Mattera, Hartley, van Siclen, Arnold and Fund blatant and fraudulent use of devices, schemes and artifices to defraud Plaintiffs; their untrue statements of material fact and/or omissions of material facts necessary to make the statements not misleading; and their acts, practices and course of conduct which operated as a fraud and deceit upon the purchasers of securities, all in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.  Defendants made blatant and fraudulent misrepresentations in soliciting Plaintiffs to invest $4.525 million to acquire shares in Praetorian and/or G. Power, based on false representations that such interests would provide indirect ownership of Series A Preferred shares in Fisker Automotive Inc. ("Fisker").  Praetorian, G. Power, Mattera, Hartley and van Siclen, at various times, represented to Plaintiffs these shares were owned by Mattera, Praetorian or G. Power.  However, after they made their investment, despite repeated requests, Plaintiffs never received the closing documents or the shares reflecting their membership interest in Praetorian.  Plaintiffs then discovered that Mattera, Praetorian and G. Power did not own the Fisker Series A Preferred shares. Defendants Arnold and

First American, the escrow agent chosen by the other Defendants, participated in these securities violations by disbursing Plaintiffs moneys, without Plaintiffs' permission, to some or all of the other Defendants, while Plaintiffs were waiting for the closing on the transaction. Meanwhile, the phony escrow agents, Defendants First American and Arnold, violated their duties as escrow agents to the Investors who trusted them to hold Plaintiffs' moneys pending a proper closing of this transaction, as set forth in the subscription and other documents.   Plaintiffs also seek alternative or conjunctive common law relief.

2.      This is also an action for breach of fiduciary duty and conversion against the escrow agents for this transaction, First American and Arnold.  The moneys to fund Plaintiffs' investment were wired into First American's escrow account, which was controlled by Arnold.  Pursuant to the Confidential Private Placement Memorandum and Subscription Documents, the escrowed funds were supposed to be released from escrow only upon the closing of the transaction, which would occur when shares were issued in G. Power and/or Praetorian reflecting Plaintiffs' membership interest in G. Power or Praetorian, and their indirect ownership (through their G. Power or Praetorian shares) of the Fisker Series A shares (requiring that those Fisker shares also be transferred to G. Power or Praetorian).  However, Plaintiffs were never provided closing documents, including proof that Praetorian owned the Fisker shares and the transaction did not (and never) closed.  Thus, Investors' moneys should have been returned when Investors rescinded the transaction.  However, while Plaintiffs waited for the transaction to close, Arnold and First American breached their fiduciary duties and converted Plaintiffs moneys when they did not return Plaintiffs' moneys, when they failed to

account to Investors for their moneys, and, when they distributed the moneys to one or more of the other Defendants (directly, or indirectly through their interests in Praetorian or G. Power).

3.      This is also an action against Defendants Praetorian, G. Power, Mattera, and van Siclen for conversion, civil theft, and the imposition of a constructive trust arising from the apparent distribution of those moneys.

4.      This is also an action for conspiracy against all Defendants with respect to the foregoing torts and violations of law.

5.      This is also an action for breach of contract against Praetorian, because Praetorian took Investors' money but did not issue them shares representing a corresponding interest in Fisker shares and insofar as Praetorian and G. Power do not own the Series A Preferred shares in Fisker.

6.      In short, Defendants Praetorian, G. Power, Mattera, Hartley, van Siclen and Fund fraudulently induced Plaintiffs to purchase membership interests by telling Plaintiffs that G. Power owned $20 million Series A Preferred shares in Fisker, and that through their investment, they would be purchasing an indirect ownership interest in Series A Preferred Fisker shares to the extent of their purchase.

7.      As it turned out, there was nothing legitimate about the entire transaction; it was a scam from day one.  Plaintiffs are informed and believe, as set forth below, that Mattera, Praetorian and G. Power did not own $20 million Series A Preferred shares in Fisker.  Praetorian and Mattera did not own the indirect interests in Fisker they were purportedly selling.  The escrow account to whom Plaintiffs sent their moneys pending closing was not an honest escrow, and Plaintiffs' moneys are now gone.  As discussed

below, Defendants simply used devises, schemes and artifices to defraud Plaintiffs; made untrue statements of material fact and/or omissions of material facts necessary to make the statements not misleading; and engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of securities, all in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

8.     Praetorian's, G. Power's, Mattera's, Hartley's, van Siclen's and Fund's deceitful acts, actions, artifices, schemes and misrepresentations as detailed below induced and caused Investors to collectively deposit $4,525,000 in an escrow with First American, for the purchase of indirect interests in Fisker Series A-1 shares, through membership shares in Praetorian, as follows:

a)     The 2009 Hubbard Family Trust - $500,000, on or about November 4, 2011;

b)     Albert Angelo, Jr. - $250,000, on or about February 11, 2011;

c)     Craig Angelo - $250,000, on or about February 11, 2011;

d)     Robert Masterson - $150,000, on or about February 11, 2011[1];

e)     Dan Meadows - $1,000,000, as follows: on or about August 6, 2010, $500,000; on or about October 27, 2010, $500,000

f)     Jerry Bayles - $1,000,000, as follows: on or about August 18, 2010, $100,000; on or about September 8, 2010, $400,000; on or about October 28, 2010, $250,000, on or about October 28, 2010, $250,000; and

g)     Praefectus Capital, LLC - $1,375,000, as follows: on or about November 18, 2010, $900,000, on or about November 29, 2010, $325,000, on or

---

[1]   Masterson's individual investment was in addition to an investment through Praefectus.

about December 14, 2010, $125,000, on or about, December 23, 2010: $25,000.

9.      In addition, Defendants never caused Praetorian or G. Power to deliver to Plaintiffs their shares/membership interests in Praetorian.

## JURISDICTION AND VENUE

10.     The claims herein asserted arise under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78(b), SEC Rule 10b-5, and Florida common law.

11.     The Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. § 1331 and 1337(a); pursuant to its supplemental jurisdiction under  28 U.S.C. § 1367, because said claims  "are so related . . . that they form part of the same case or controversy"; and (as to the non-Florida Defendants); and pursuant to the Florida's Long Arm Statute, *Fla. Stat.* § 48.193(a) ("Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state") *Fla. Stat.* § 48.193(b) ("Committing a tortious act within this state"), and *Fla. Stat.* § 48.193(g) ("Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state").

12.     Venue is proper in the Southern District of Florida pursuant to Section 28 U.S.C. § 1331(b), (c) and (d).  As noted below, Defendants Mattera and Arnold reside in this District.  Defendant First American is incorporated in Florida and does business in this District.  Defendant van Siclen has been an officer of Florida corporations with an office in this District.  Many of the acts or omissions occurred in this District.  Plaintiffs

wired the escrowed funds for the purchase of their shares/membership interests to a Fort Lauderdale based escrow agent, who was supposed to close the transaction.  In furtherance of the overall scheme to defraud Plaintiffs, the Florida-based escrow agents breached their fiduciary duties by failing to return the Investors' moneys when the Investors rescinded the transaction and, upon information and belief, by disbursing the moneys without instructions to do so from the Investors, in violation of the terms of the escrow, and without ensuring that a closing occurred.  Insofar as the moneys were disbursed, a conversion of Plaintiffs' funds occurred in this District.

13.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means, facilities and instrumentalities of interstate commerce, including but not limited to: banks, wires, mail, email, internet, interstate telephone communications, and interstate modes of travel (such as air travel).

**PARTIES**

14.    Plaintiff, The 2009 Hubbard Family Trust ("Trust"), is a New Mexico trust.

15.    Plaintiff, Praefectus Capital LLC ("Praefectus"), is a South Dakota limited liability company.

16.    Plaintiff, Albert Angelo ("A. Angelo"), is a resident of Washington.

17.    Plaintiff, Craig Angelo ("C. Angelo"), is a resident of Washington.

18.    Plaintiff, Robert Masterson ("Masterson"), is a resident of California.

19.    Plaintiff, Dan Meadows ("Meadows"), is a resident of Arizona.

20.    Plaintiff, Jerry Bayles ("Bayles"), is a resident of Florida.

21.    Plaintiffs shall hereafter be referred to as the "Investors."

22.     Defendant, John Hartley ("Hartley"), is a resident of the Turks and Caicos Islands, but did business in the United States and Florida through his involvement in this transaction, and committed the below-referenced tortious acts in Florida, as set forth below.  Hartley is a founding partner and director of Fund.

23.     Defendant, John A. Mattera ("Mattera"), is a resident of Florida, is doing business in Fort Lauderdale, Florida and Palm Beach County, Florida, as set forth below, and committed the below referenced tortious acts in Florida.  At all times, Mattera held himself out to Plaintiffs and others as controlling the Fisker shares.  At all times, Mattera was a director of Fund and chairman of its Advisory Board, and held himself out as such.

24.     Defendant, Bradford van Siclen ("van Siclen"), is a resident of New Jersey, is doing business in Fort Lauderdale, Florida, as set forth below and as an officer of Florida corporations, including but not limited to, Saudi American Holdings, Inc., Exhibit 5,[2] and committed the below-referenced tortious acts in Florida.  At all times material, van Siclen is, and was, the managing member of Praetorian, and a founding partner and managing director of Fund.

25.     Defendant, John Ray Arnold ("Arnold"), is a resident of Florida, is doing business in Florida as set forth below, and committed the below referenced tortious acts in Florida. Arnold is First American's sole shareholder, director and officer. D.E. 7-2.[3]

---

[2]     Plaintiff uses the same exhibit numbering as in its original pleading.

[3]     To simplify this pleading, where Exhibits have been made part of the record already, they will be referenced, but not reattached, here.

26.     Defendant, Praetorian G. Power II, LLC ("Praetorian"), is a Delaware limited liability company doing business in Florida as set forth below, and committed the below-referenced tortious acts in Florida.

27.     Defendant, G. Power II ("G. Power"), was held out by Plaintiffs to be a Delaware corporation or limited liability company.  G. Power did business in Florida as set forth below, and committed the below-referenced tortious acts in Florida.  Praetorian appears to be G. Power formed under another name.

28.     Defendant, First American Service Transmittals, Inc. ("First American"), is a Florida corporation doing business in Florida as set forth below, and committed the below-referenced tortious acts in Florida.   The address listed as First American's business office in Fort Lauderdale is a UPS mail box.  As noted below, First American's fax number is 954-337-2964, which is a Broward County fax number.

29.     Defendant, Praetorian Fund. Ltd. ("Fund"), is a British Virgin Islands corporation, doing business in Florida and the United States, as set forth below, and through the activities of its agent, van Siclen.  Fund committed the below-referenced tortious acts in Florida and elsewhere.  Fund is purported to be a hedge fund. In addition, Fund does business in Broward County, Florida, as reflected by its fax number, 954-337-2964, which is the same fax number as First American's fax number.

## FACTS COMMON TO ALL COUNTS

### The Fall 2010 Deals with Meadows, Bayles, Trust and Praefectus

30.     Fisker Automotive Inc. ("Fisker") issued Series A Preferred stock, which was sold through its broker AEI.

31.     In the summer of 2010, Defendant van Siclen told Elizabeth Evans ("Evans"), who is a Managing Member for Praefectus, that Mattera owned or controlled the Series A Preferred Fisker shares that were for sale. On July 22, 2010, van Siclen copied Evans with subscription documents.

32.     In or about late July or early August 2010, van Siclen held a meeting with Plaintiff Meadows (who also attended on behalf of Bayles as well) by telephone, during which he explained the benefits of investing in Fisker and solicited Plaintiffs to buy shares in a limited liability company, through which they would indirectly own Fisker shares.

33.     Prior to Meadows' and Bayles' investment, Van Siclen told Meadows 9on behalf of Bayles as well) that four people were involved with Fund and Praertorian/G. Power.

34.     On October 19, 2010, van Siclen held a meeting with Plaintiffs Praefectus and Trust (who were in different states) by telephone and web presentations, during which he explained the benefits of investing in Fisker and solicited Plaintiffs to buy shares in a limited liability company, through which they would indirectly own Fisker shares.

35.     At these web and telephone meetings, van Siclen told these Plaintiffs that Fisker is not a publicly traded company, and therefore is only permitted to have a limited number of shareholders.

36.     Van Siclen also explained that to comply with the required limitation on the number of shareholders, the Fisker shares would have to be owned in the name of an entity.

37.     Van Siclen further told these Plaintiffs that the mechanism for their investment in the Fisker shares would be to buy shares in a limited liability company that would be the record owner of the Fisker shares, as Mattera had contributed the Fisker Series A shares Mattera supposedly owned, in return for an interest in the LLC. The Investors' membership interest in the limited liability company would be in proportion to their interest in the Fisker shares.  Thus, the members of the limited liability company would indirectly own the Fisker shares.

38.     Van Siclen identified G. Power as the limited liability company to be used for the transaction and told Plaintiffs that other investors had already invested.

39.     Van Siclen told Plaintiffs that G. Power was the record owner of 10 million Fisker Series A Preferred shares.  The Fisker shares were valued at $2 per share.

40.     Mattera also actively solicited the investment by Plaintiffs, through Praetorian and Fund.

41.     On October 12, 2010, Mattera, on his own behalf and on behalf of Praetorian and Fund, provided Praefectus with the Delaware Corporate registration documents for Praetorian and for other Praetorian companies.  He also sent Praefectus an email with an article regarding a potential Fisker IPO, stating, "Its 'Leave them in the Dust Time' on this deal."

42.     Mattera, van Siclen, Hartley, G. Power and Fund caused various documents to be prepared to promote the sale of shares in the LLC entity which would own the Fisker shares.  These documents included G. Power's Confidential Private Placement Memorandum ("Private Placement Memo"), *see* Exhibit 1, and the subscription documents described below.  Exhibit 2.  The Private Placement Memo

states, "Subscription documents for the investment LLC, G. Power formed by and for
Co-Purchasers by Praetorian Global Fund, Ltd."  Exhibit 1, Private Placement Memo at
p. 3.  The offering documents included information from Fisker. Prior to each of the
Investors' investment, Fund, van Siclen, Hartley, Praetorian, G. Power and/or Mattera
provided Plaintiffs (directly or indirectly) with these documents.

43.    Prior to each of the Investors' investment, Fund, van Siclen, Hartley,
Praetorian, G. Power and Mattera provided Plaintiffs (directly or indirectly) with the
Private Placement Memo, which represented that G. Power already owned $20 million
in shares of Fisker.[4]

44.    For example, on October 7, 2010, Mattera, on his own behalf and on
behalf of Praetorian and Fund Mattera provided Elizabeth Evans of Praefectus with the
Private Placement Memo, subscription documents, and escrow instructions for First
American, with respect to Praefectus' investment.  *See* Exhibit 9. Earlier that day,
Mattera had told Evans those documents were being typed.

45.    With respect to other Plaintiffs, Mattera, and van Siclen provided these
documents at Mattera's direction.

46.    The Private Placement Memo stated:

"This   Confidential   Private   Placement   Memorandum
(together   with   all   exhibits   and   attachments,   this
"Memorandum") relates to **the offer and sale by G. Power
II, a Delaware Corporation, ('the Company', 'we', or 'us')**

---

[4]     The Private Placement Memoranda received by each Plaintiff contained the
same material representations. There are non-material differences in drafts or versions
of the the Private Placement Memorandum referred to in this Amended Complaint, such
as (for example) a description of the name of the LLC which was the purported vehicle
for the indirect ownership of the Fisker shares (G. Power or Praetorian).  However, G.
Power was apparently never even formed in Delaware and the name of the LLC is not
material to this scheme.

> **of shares (the 'Shares') of our Series A-1 Convertible Preferred Stock of Fisker Automotive Inc., ('Fisker') of up to $20,000,000 of shares (the 'Shares')** of our Series A-1 Convertible Preferred Stock (the 'Series A-1 Preferred'), at a purchase price $2.00 per share ('the offering'). **Each share is initially convertible into one share of our common stock ('Common Stock') in Fisker Automotive Inc**."

Exhibit 1, Private Placement Memo at p. 1.

47.    A section of the Private Placement Memorandum titled, "Summary of the Offering," stated that these Defendants (through G. Power) were offering "up to $20 million, in the aggregate, of Series A-1 Preferred Stock." ('Series A-1 Preferred').

48.    As part of their solicitation of Plaintiffs' investment, van Siclen, Mattera, Hartley, Praetorian, G. Power, and Fund also provided Plaintiffs (directly or indirectly) with subscription documents (which as noted above were prepared by Fund, an entity controlled by van Siclen and Hartley), which represented that Praetorian <u>already owned $20 million in shares of Fisker.</u> Exhibit 2.[5]

49.    Based on Hartley's position as a director of Fund, his conduct (described below) after the funds were wired, Hartley made and disseminated the Private Placement Memo and subscription documents and was also a "maker" of the representations contained therein.  In addition, Hartley's actions evidence his participation in the deceitful scheme perpetrated on Plaintiffs.

50.    One of the subscription documents was titled, "Certain Terms Pertaining to the Offering of Interests in Praetorian G Power II, LLC" ("Subscription Terms"). The Subscription Terms stated,

---

[5]    The subscription documents received by each Plaintiff contained the same material representations.

> **"Co-investment made into PRAETORIAN POWER II, LLC purchases interests entitling member to Preferred Shares of Fisker Automotive Inc., held by The Praetorian Fund, at $2.00…**Praetorian has formed the LLC for the purpose of aggregating Co-Investors/Members' investments into the Company's Preferred Shares.  Co-Investor/Members will purchase 'Investor Member Interests' in the LLC, which will in turn invest in Preferred at the initial and any subsequent closing of such investments.  However, that the Managing Member will close the investment to additional members should the effective conversion price of the interests exceed $1.000 for each share held by the LLC of Fisker Automotive, Inc."

Exhibit 2.

51.     Van Siclen signed the Limited Liability Company Agreement for Praetorian, which was an exhibit to the subscription documents as "Managing Member" of Praetorian.

52.     Unbeknown to the Investors, van Siclen's, Hartley's, Fund's, Mattera's, Praetorian's, and G. Power's representations were blatant falsehoods.   Mattera, Praetorian and G. Power did not own $20 million of Fisker Series A-1 Preferred shares.

53.     Indeed, as confirmed by Fisker, Mattera, G. Power and Praetorian did not even own $4,525,000 Fisker Series A Preferred Shares, representing the corresponding purchase by Plaintiffs of membership interests in the limited liability company.  Defendants simply schemed to take plaintiffs' moneys, and to give them nothing in return.

54.     Later, instead of G. Power, the investment vehicle became Praetorian.

**All of Plaintiffs are Lulled into Believing the Transaction was Safe, because Their Moneys were being sent to an Escrow Account**.

55.     The Plaintiffs' deals were (or were represented by Defendants) to be structured such that an escrow account would be opened with Defendant First

American.  Plaintiffs would wire their funds into the account, G. Power and Mattera would deposit the shares representing their membership interests, and Plaintiffs would then hold the shares in the limited liability company directly.

56.    A section of the Private Placement Memorandum titled, "Summary of the Offering," states:

> All proceeds prior to their purchase of interests in the G Power LLC of the Series A-1 Preferred Stock offering shall be deposited into an escrow fund (the 'Main Escrow Fund') First American Transmittals via BB&T bank, Ft. Lauderdale, Florida, USA.  At a closing, all purchasers of interests in G Power II, LLC, must execute all documents and take all such action as the escrow agent shall deem necessary or appropriate in connection with the purchase.

Exhibit 1.

57.    This structure was to ensure that before the Investors' money was released from escrow, they could conduct due diligence, including but not limited to: reviewing the transaction documents and structure of G. Power or Praetorian to ensure that they were acquiring membership interests which provided indirect ownership of $4,525,000 in Fisker Series A-1 Preferred shares, and that G. Power or Praetorian owned $20 million Fisker Series A-1 Preferred shares.

58.    To that end, the Subscription Terms were not self-executing and on their face constituted an "offer to purchase the Interests." Exhibit 2.

59.    The subscription documents under the heading "Additional Information," in ten paragraphs over two pages, made it clear that a closing would occur in the future, and permitted Investors to review the closing documents (described as "Transaction Documents") and to "rescind their offer in writing" should the closing documents

"materially and adversely differ (from an investor's point of view) from the terms described in the Transaction Documents initially made available to them."  Exhibit 2.

60.    Mattera selected First American as the escrow agent. On October 12, 2010, Mattera, on his own behalf and on behalf of Praetorian and Fund, gave Praefectus the information concerning the escrow agent and its account.  The escrow agent was First American. Later, on November 18, 2011 (before Praefectus wired its moneys) Mattera provided Praefectus with the wiring instructions to send its moneys to First American, in the form attached as Exhibit 10.

61.    Later, Mattera, on his own behalf and on behalf of Praetorian and Fund, confirmed that Praefectus' wire had been received by the escrow agent, and provided a summary.

62.    The transaction was structured such that Praetorian was issuing membership shares to Plaintiffs in exchange for their moneys escrowed. Thus, implicit in the structure of this transaction was that any person who had the authority to authorize or accept disbursement of the moneys would have been a "control" person or person with authority with respect to the sale of the securities by Praetorian to Plaintiffs.

63.    As far as Plaintiffs knew, that person should have been van Siclen, because the subscription documents charged him, as "the Managing Member" of Praetorian, with identifying material changes to the closing documents for the investors. See Exhibit 2, Certain Terms etc. "Additional Information."

64.    As the deal was structured and the escrow terms written, no third party outsider could authorize the disbursal of the escrowed moneys.

65.     However, Defendant Mattera apparently had the authority to instruct the escrow agent to withdraw Plaintiffs' moneys from escrow.  In or about late September or early October 2011, Plaintiff Praefectus, through Evans, spoke to Defendant van Siclen, who told Praefectus that he did not have access to the escrow account to which Plaintiffs' moneys were wired and that the moneys were not disbursed to him or Praetorian. Van Siclen stated that he had no authority with respect the account, and that only Defendants Mattera or John Arnold had access to the funds in that account.

66.     Under these circumstances (and the others discussed below), Mattera had "control" and "authority" over the statements made to Plaintiffs which induced them to invest, and was plainly a "maker" of the above referenced statements, and his actions represented a scheme or artifice to defraud Plaintiffs.

67.     However, Defendants' statements about the escrow and their actions with respect to the escrowed moneys, were also blatant falsehoods and simply part of the scheme to defraud. Defendants had no intent to maintain Plaintiffs' moneys in escrow, but intended to convert Plaintiffs' moneys, leaving Plaintiffs with nothing in return.  First American and Arnold (falsely and incorrectly) accepted Plaintiffs' moneys and subscription documents, but deny the existence of an escrow arrangement, which flatly contradicts the private Placement Memo, the subscription documents, Mattera's email to Praefectus concerning the "escrows" fax information, the wiring instructions which describe First American as an "escrow agent," and van Siclen's statements.  There is simply no excuse for the disbursal of Plaintiffs' moneys under these circumstances and the only explanation for Defendants' actions is that they were scamming Plaintiffs.

68.     Mattera, van Siclen, Hartley, G. Power and Fund were the "makers" of these communications.  Each had "control" and "authority" over the statements which induced Plaintiffs to invest, and was plainly a "maker" of the above referenced statements.  For example, van Siclen was the managing member of Praetorian and the managing director of Fund; Mattera holds himself out as a founding member, chairman of the Advisory Board and a director of Fund, and had control and authority over the escrow account or moneys; Hartley is a founding partner and director of Fund; all of these Defendants were partners with respect to their dealings with Plaintiffs; and, upon information and belief Defendants obtained Plaintiffs moneys after it was disbursed from the escrow account.

69.     First American and Arnold were "makers" of the statements concerning the escrow.  If they had not agreed to be Plaintiffs' escrow agent, First American and Arnold should have sent back their moneys.

**Mattera Actively Solicits Fisker Shares Manifests his Involvement on Behalf of Himself, Fund and Praetorian**

70.     At all times, for the reasons noted above and below, Mattera acted a primary, first party, "maker" of the statements in the Fund's documents.

71.     Prior to their investment, Meadows, Bayles, Trust and Praefectus were given the above referenced Private Placement Memo, the subscription documents, and the escrow/wiring instructions.

72.     After soliciting the initial investments above, Mattera continued to solicit additional investors, asking Elizabeth Evans of Praefectus to pass on information he had sent to her (including the Private Placement Memo and subscription documents), to interested investors.

73.    In addition to his role in making and disseminating the Private Placement Memo and subscription documents, on November 4, 2010, Mattera on his own behalf and on behalf of Praetorian and Fund, sent Fisker's October 2010 Investor Presentation to Praefectus.

74.    In November 2010, on his own behalf and on behalf of Praetorian and Fund, Mattera arranged for tickets to the Los Angeles Auto show for Investors Praefectus, Ed Burger, the Trustee of Trust; and Plaintiff Masterson, among others.

75.    Mattera on his own behalf and on behalf of Praetorian and Fund, provided Praefectus with Fisker's forecasts, certain financial records, Fund's legal authority to act under the British Virgin Islands Securities and Investment Act of 2010.

76.    Mattera, on his own behalf and on behalf of Praetorian and Fund also communicated, by email and otherwise, with Elizabeth Evans of Praefectus, about finding other investors for Fisker shares.  Mattera often used his Fund email address and signature block.

77.    In or about the December 2010/January 2011 time frame, the initial Plaintiffs received a partial list of the shareholders.

78.    Shortly after their investment, several of the early Investors met Mattera at the Los Angeles Auto Show.  John Mattera introduced the Investors to Henrik Fisker in the VIP booth.  In this conversation, Mattera told Henrik Fisker (in the presence of these Plaintiffs) that the Investors were Series A shareholders and wanted to see the car and hear more about the company.

79.    It is simply undeniable that Mattera was behind each solicitation of each Plaintiff, whether he directly spoke to that Plaintiff or not.  In January 2010, Mattera, on

behalf of Fund, sent an email to Elizabeth Evans, with a message to van Siclen included. In the email, Mattera inquired whether there were "any other investors for the Fisker project as we are still raising money. I need another $35,000,000.  Remember, I have dinner with Henrik on the 13th.  Need as much as we can get in by then."  Exhibit 11.

80.     In late January 2011, Plaintiff Trust met with Mattera and his wife in Palm Desert, California.  Mattera was in Palm Desert promoting the sale of indirect interests in Fisker shares, through membership interests in Praetorian.   Mattera was also promoting the Praetorian Global Fund, which Mattera also represented to Trust that he had founded.   Mattera assured Trust that its purchase of Praetorian shares (and, indirectly, Fisker shares) was "going great."   Mattera told Trust that Pictet and Cie in Switzerland held all stock certificates and that Conifer Fund Services handled their fund paperwork.  During this conversation, Mattera was also carrying a small federal express envelope, and he commented that it contained a Fisker stock certificate which he was sending to be transferred.   Moreover, as noted below, Mattera promoted the sale of Praetorian shares to Masterson at this event (and later).

81.     In fact, the transaction was not "going great," for the reasons set forth below.

82.     Mattera's statements were untrue insofar as Praetorian did not own any Fisker shares or Preferred Series A-1 Fisker share, and the statement lulled these Investors into taking no action to protect their interests in their $1,875,000 investment. If Mattera had told the truth, all of the Plaintiffs who had invested until that date could

have protected themselves then, and Masterson and the Angelos' would not have invested later.

### Hartley and Van Siclen Meet with Trust

83.    Meanwhile, in early January 2011, Defendant Hartley, Hartley, as a director of Fund, met with Dee Hubbard, a co-trustee of Plaintiff Trust, and van Siclen at dinner in the Turks and Caicos Islands.  They discussed this transaction.

84.    Hartley and van Siclen stressed what a great investment deal it was. They told Dee Hubbard that the shares came from Mattera, i.e. that the shares had already been deposited by Mattera with Praetorian.

85.    Then they discussed a new fund, The Praetorian Global Fund that was being started. They told him the Global Fund would be started with stocks from Mattera's personal portfolio. It would include additional Fisker shares, as well as stocks he had in Groupon and others. They were to let him (or us) know when they had the complete list of stocks in the new fund.

86.    They suggested that Trust buy additional Mattera Fisker shares through these investment vehicles, but Trust did not do so.

87.    Van Siclen's and Hartley's statements were untrue insofar as Praetorian did not own any Fisker shares or Preferred Series A-1 Fisker share, and the statement lulled Trust into taking no action to protect its interests in its $500,000 investment.

88.    As noted below, Hartley later attempted to cover up Defendants' illegal and conspiratorial acts.

### The Early 2011 Deals with Masterson, A. Angelo and C. Angelo

89.     At that same conference in Palm Desert where Trust met with Mattera in late January or early February 2011, Mattera, and his wife also met with Masterson.

90.     At the meeting and after the meeting, Mattera called Masterson numerous times and represented to Masterson that Masterson could acquire an additional indirect interest in Fisker Series A shares, by buying more Praetorian shares.

91.     Shortly thereafter, Plaintiffs C. Angelo and A. Angelo spoke to Dee Hubbard, who told them about this deal.

92.     As these additional Plaintiff Investors were located, Mattera, van Siclen and/or Hartley then caused Investors Masterson, C. Angelo, and A. Angelo to be given the Private Placement Memorandum, a subscription document and wiring instructions. These documents contained the same material misrepresentations described above.

### The Plaintiffs Invest Their Moneys and a Escrow is Created

93.     In reasonable reliance on the above-referenced representations and actions, on the apparent legitimacy of the transaction, and in connection with their acquisition of shares in Praetorian which would represent the corresponding indirect interest in Fisker shares, each Plaintiff signed subscription agreements with Praetorian.

94.     In connection with their acquisition of shares in Praetorian which would represent the corresponding indirect interest in Fisker shares, Plaintiffs were provided with wire instructions for transmittal to First American, which identified pertinent information for the escrow.  These instructions were provided, directly or indirectly, by the Defendants. The document was titled "Wire Transfer Instructions," and identified "First American Service Transmittals, Inc." as the Escrow Service for the Praetorian

Fund, LTD., Praetorian G. Power II, LLC." The identified beneficiary of the wire transfer was First American Service Transmittals, Inc, with a payment reference of the Praetorian Fund, Ltd./Praetorian G Power II, LLC and the Investors' name, an account number at BB&T Bank, and instructions to fax the subscription documents to First American at  954-337-2964, the number van Siclen and Mattera said was "the escrows (sic)," e.g. First American's, fax number.  *See* Exhibit 12.

95.    In connection with their acquisition of shares in Praetorian which would represent the corresponding indirect interest in Fisker shares, in reasonable reliance on the above-referenced representations and actions by the Defendants, and on the apparent legitimacy of the transaction, Plaintiffs variously wired, or caused to be wired, the moneys identified in ¶ 8 above, into First American's account at a BB&T bank branch in Fort Lauderdale, Florida and transmitted, or caused to be transmitted, the subscription documents to First American. See Exhibits 9 and 10.  First American and Arnold accepted Plaintiffs' moneys and the subscription documents, establishing an escrow pending a closing in which Plaintiffs would receive their indirect interest in Fisker Series A-1 Preferred shares in exchange for their moneys.  Until that time, Investors' funds were to be held in escrow pending a closing.

96.    In addition, in connection with their acquisition of shares in Praetorian which would represent the corresponding indirect interest in Fisker shares, in reliance on the written subscription documents and the above-referenced oral representations by Mattera and the above referenced actions, Masterson directly invested $150,000 in G Power.

97.    First American and Arnold received Plaintiffs' moneys and the subscription documents, which created an escrow arrangement with Plaintiffs as a matter of law.

98.    Pursuant to this escrow arrangement, even "in the absence of an express agreement, written or oral, the law will imply from the circumstances of the escrow that the agent has undertaken a legal obligation (1) to know the provisions and conditions of the principal agreement concerning the escrowed property, and (2) to exercise reasonable skill and ordinary diligence in holding and delivering possession of the escrowed property (i.e., to disburse the escrowed funds) in strict accordance with the principals' agreement."

99.    Defendants Arnold and First American owed Plaintiffs fiduciary duties.

100.    Plaintiffs relied on Defendants' actions and representations, as set forth above and below, by wiring their moneys to the purported escrow agent, First American, and by waiting for the transaction to close.

**Plaintiffs Await Closing; Defendants Reassure Plaintiffs that the Transaction was Proceeding Normally**

101.    The initial transactions were supposed to close in the late fall of 2010, in Fort Lauderdale, Florida.  Other transactions were supposed to close later, and shortly after the investment. At closing, Investors would receive, among other things, their shares in the LLC and indirect ownership of Fisker Series A shares.

102.    However, as discussed below, the transactions never closed; Plaintiffs never received their shares or membership interest in Praetorian, or their indirect interests in the Fisker shares.

103.    Meanwhile, during the period after Plaintiffs wired their moneys and before Plaintiffs rescinded the transaction in August 2011, Mattera, van Siclen, Hartley,

Praetorian and Fund repeatedly reassured Plaintiffs that the deal was proceeding toward a closing.

104.    Examples included Mattera's discussions with Praefectus, Trust and Masterson, described above.

105.    In another example, on December 28, 2010, van Siclen sent a letter to Meadows in which he stated that Meadows invested in "G Power II, LLC," "a single purpose LLC that is capitalized with 10,000,000 Series A-1 Preferred shares issued by Fisker Automotive Corporation," and that "these shares" were selling on the "secondary market" for "$4.25" per share.  Van Siclen's statement was untrue insofar as the LLC for which he was the Managing Member did not own any Fisker shares or Preferred Series A-1 Fisker share, and the statement lulled Meadows and his friend, Bayles into taking no action to protect his interests in their $2,000,000 investment. If van Siclen had told Meadows the truth, all of the Plaintiffs who had invested until that date could have protected themselves then, and Masterson and the Angelos' would not have invested later.

106.    After not having received their shares, Plaintiffs started inquiring when the transaction would close and when they would receive their shares.  They also began to ask for proof that Praetorian actually owned the Fisker shares.

107.    In response, van Siclen told Plaintiff Praefectus that the Fisker Series A Preferred shares were in Switzerland and that there was an irrevocable transfer agreement signed by John Mattera that would provide the Series A shares to G Power II LLC.   However, Plaintiffs were never given a copy of the irrevocable transfer

agreement, an explanation of whose names were on the certificates, or informed whether Fisker had been instructed to transfer the certificates into Praetorian's name.

108.   In May 2011, Plaintiff Trust contacted Defendant Hartley at the Fund by email regarding when the transaction would close. Trust copied Mattera and Plaintiff Praefectus with this email.

109.   However, Hartley simply covered up Defendants' wrongdoing and claimed that the Fisker Series A Preferred shares were owned by G. Power (or Praetorian) already. On May 17, 2011, Hartley responded to Trust in an email, which he copied to Defendants Mattera and Praefectus, in which he stated, "We have this in hand through the Gpower structure on the basis which John M has outlined to you."  Exhibit 3.

110.   Hartley's statement was untrue insofar as the GPower did not own any Fisker shares or Preferred Series A-1 Fisker share, and the statement lulled Trust and Praefectus, into taking no action to protect their interests in their collective $1,875,000 investment. If Hartley (or Mattera who was copied on the email chain) had told Trust the truth, all of the Plaintiffs could then have taken action to protect their investment.

111.   On May 25, 2011, Trust wrote Hartley back and copied Mattera and Praefectus.  In its reply, Trust asked the logical next question: when would Plaintiffs receive their closing documents?  Exhibit 4.

112.   On May 26, 2011, Hartley and Fund replied to Trust, copying Mattera and Praefectus.  More than six months after Plaintiffs wired their moneys to First American, Hartley finally admitted that the transaction had, in fact (and contrary to his email of May 17, 2011), not yet closed.  Hartley wrote an email to Trust stating:

> We are still working on structural issues with our depositary and professional advisors. The licenses we need in the BVI

and Cayman were issued to Praetorian Managers Ltd., and
Praetorian Global Fund Ltd a couple of months ago…

**Your ownership documents with supportive
documentation will be issued to you no later than
August 1, 2011.**

**We will of course keep you informed of substantive
developments at both Praetorian and Gpower**.

Exhibit 4. However, in his email, Hartley continued to conceal and failed to disclose the critical fact that neither G. Power nor Praetorian in fact owned of record any Fisker Series A shares.

113.   However, August 1, 2011 came and went, but the transaction still did not close, and Hartley and Mattera never told Plaintiffs that Plaintiffs' moneys had been disbursed or that Praetorian and Mattera did not own Fisker Series A-1 Preferred shares.

**Plaintiffs Learn that Praetorian Never Owned the Series A Shares**

114.   Plaintiffs were told they needed to talk to Mattera to get their questions answered.

115.   After a series of discussions, Mattera finally admitted that G. Power and Praetorian did not own the Series A Preferred Fisker shares.  Mattera then represented to Plaintiffs that KPMG had not finished some work which was necessary before G. Power or Praetorian could take title to the shares.

116.   However, Plaintiffs became increasingly alarmed and began to look into the backgrounds of Defendants.

117.    Investors' concerns were heightened when they discovered a case *titled Gardner, et al. versus Mattera*, *et al.*, ("Gardner"), which was filed in the Southern District of Florida under Case No. 11-807-03-CIV-Middlebrooks/Johnson in June 2011.

118.    The facts alleged by the *Gardner* plaintiffs were disconcerting to say the least; the *Gardner* plaintiffs had sued some of the same players named here: Mattera, Arnold (as escrow agent) and Saudi American Holdings (a Florida corporation in which van Siclen had been an officer) and they had alleged facts very similar to this case.

119.    In the *Gardner* action in June 2011, investors in Saudi American Holdings sued Mattera and Arnold and alleged they were induced to put up money for a holding company that was supposed to acquire Saudi American shares.  Like here, the *Gardner* plaintiffs alleged that their money had been wired to an "escrow company" controlled by Arnold.  Like here, the shares were not delivered.   *Id.*

120.    When Plaintiffs learned of the *Gardner* lawsuit, they contacted van Siclen.

121.    Even though he was a principal of Saudi American, Exhibit  5, van Siclen claimed not to know of the lawsuit.  In addition, van Siclen said that "we don't use the same escrow company."

122.    While the escrow company in the *Gardner* case had a slightly different name than the one used by Defendants in this case, it turns out the escrow company (like here) was also controlled by Arnold.  Exhibit 6.

123.    In addition to the *Gardner* case, Plaintiffs became further alarmed when they learned that Mattera and Arnold were subjects of enforcement action by the United States Securities and Exchange Commission.  Exhibit 7.

124.   Investors then learned that, in 2009, the SEC charged Mattera with a fraudulent penny stock scheme involving a company he controlled called Prime Time. The SEC alleged that Prime Time made fraudulent public disclosures to pump up its stock price at the same time that Mattera was illegally selling unregistered stock.  Based on the SEC's allegations, Mattera agreed to a permanent injunction against future violations of Section 10 of the Securities and Exchange Act, a permanent injunction against future violations of Section 5 of the Securities Act, a permanent injunction against participation in any offering of penny stock, and payment of illegal profits, penalties and interest.  *Id.*

### Plaintiffs Rescind the Transaction

125.   Based on their concerns that the transaction had never closed and the absence of proof that the Series A Preferred Fisker shares had been transferred to Praetorian, combined with their growing concerns about Mattera, van Siclen, Arnold, First American and Hartley, Plaintiffs on several occasions in the summer of 2011 gave notice in late August 2011 that they rescinded the transaction and demanded the return of their money.

126.   For example, on August 19, 2011, Trust sent a letter (by email transmission) to Mattera and van Siclen rescinding the transaction.

127.   On August 22, 2011, van Siclen responded to the Trust's letter rescinding the transaction, with an email to Trust and Mattera in which he stated, "We are in receipt of your letter.  I will respond properly when I have had a moment to speak with **my partners** on your request.  We remain committed to resolving this matter as quickly as possible."  *Se* Exhibit 8.

128.   Mattera told Praefectus that Plaintiffs' moneys were still being held in escrow.

129.   Van Siclen initially indicated that the funds would be returned.  He claimed to have consulted with counsel (whose identity he then failed to disclose), and said that the funds would be returned provided Plaintiffs signed a full release.

130.   When Meadows demanded his money back, van Siclen also told Meadows that he (van Siclen) would have to speak to his "partners."

131.   Based on the nature of the transaction, and their business relationship in Fund, van Siclen was obviously referring at least to Mattera and Hartley as his "partners," and probably Arnold as well.  Evidence of this partnership includes all of the information herein; their solicitation and promotion of Plaintiffs' investment in indirect Fisker Series A-1 Preferred shares through membership shares in Praetorian; their solicitation and promotion of Plaintiffs' to wire moneys to First American to be held in escrow pending a closing on this transaction (suggesting that Arnold and First American were their partners, too); each of their reassurances to Plaintiffs when they asked about their moneys; that Mattera was supposed to have contributed his Fisker shares to capitalize Praetorian; their relationship to Fund, which promulgated the Private Placement Memo and subscription documents; and van Siclen and Mattera's roles in circulating the Private Placement Memo, subscription documents and wire instructions to Plaintiffs.

132.   Defendants were agents of Praetorian, G. Power, Fund and First American, and for all the reasons described herein, those entities were simply vehicles for their scheme to defraud.

**Defendants Demand their Money from the Escrow Agent**

133.    Again, on August 31, 2011, Plaintiffs, through counsel, demanded that Praetorian, G. Power and Mattera return their moneys, and demanded that Arnold and First American return the escrowed funds. D.E. 7-3.

134.    However, Defendants failed, and to this date have refused, to refund Plaintiffs' money.

135.    When later contacted, Mattera, through a lawyer who claimed not to represent him for purposes of this matter but who represented that he had spoken with, professed surprise that the Fisker Series A Preferred shares had not been transferred to Praetorian.

**Plaintiffs Contact Fisker, which Confirms Preatorian and Mattera do not Own Fisker Shares**

136.    In early September 2011, Plaintiffs then contacted Fisker, whose General Counsel confirmed that Mattera, G. Power, and Praetorian do not own, separately or in the aggregate: $20 million in Fisker Series A Preferred shares, sufficient shares to satisfy Plaintiffs' membership interest, or <u>any</u> Fisker Series A Preferred Shares. Fisker's counsel told Plaintiffs, "Wilshire Capital Partners Group LLC owns 2,581,232 shares of Series B-1 Preferred Stock issued by Fisker Holdings, Inc.  Those shares were acquired by Wilshire in 4Q 2010.  John Mattera is a principal of Wilshire.  We do not show any other shares owned by Mattera, Wilshire, Praetorian or any entity that we know is affiliated with Mattera." D.E. 7-1.

137.    Plaintiffs were further alarmed when they then learned from Fisker's General Counsel that Mattera has engaged in a pattern of taking money from investors

for unauthorized purported sales of investments in Fisker shares, which he apparently had no intent to deliver to the entities formed to take title to the shares.

138.   Fisker's General Counsel added that earlier in 2011, Fisker had learned that Mattera was offering Wilshire's Series B shares in Fisker through XEN IX.  Just as he did with the Private Placement Memo in this case, Mattera used the Private Placement Memo that Fisker put together for a Series B offering and wrapped a different cover around it.

139.   The Private Placement Memorandum here was similarly structured, except that it is a Series A-1 offering, wrapped around a Fisker offering.

140.   Fisker's General Counsel then said that Fisker told Mattera to stop using their confidential information.   Jim Kramer, counsel for Fisker, authored a cease and desist letter to Mattera.

141.   According to Fisker's General Counsel, Mattera told Fisker this was all a big misunderstanding and promised to stop.  Fisker's General Counsel told Investors that Mattera told Fisker that he does not want to sell his Fisker shares.

142.   Fisker's General Counsel told Plaintiffs that in the summer of 2011, an investor contacted Fisker and told Fisker that he had invested $1.7 million in an entity identified as XEN IX, but had not received the shares. The investor inquired about the transfer of the Fisker shares.

143.   Fisker's General Counsel stated that Wilshire has never asked Fisker to authorize the transfer of its Series B. Fisker shares to XEN IX

144.   Fisker's General Counsel also said that Fisker Series A and B shares can be transferred, but there are limits.

145.   Fisker's General Counsel then informed Investors that Mattera has not made any request to authorize the transfer of the Series B shares he controls.

146.   However, Fisker's General Counsel added that Fisker was so fed up with Mattera's actions that it refused to let him participate in their Series C offering, which occurred in the spring of this year.

**Defendants Demand an Accounting from the Escrow Agent and Defendants**

147.   After not receiving their money back, Plaintiffs then demanded an accounting of their moneys from the escrow agent.  On September 12, 2011, Plaintiffs, through counsel, wrote a letter to Defendants Arnold and First American "demand[ing]…confirm[ation] of the availability of the Investors' funds in the escrow account and the amount of available funds," and "if any moneys have been disbursed or released, …for an accounting of same, including confirmation and proof of the amount of the disbursement, each document showing any written instructions you received related to each disbursement, and any documents executed in connection with the disbursement of the escrowed moneys." D.E. 7-4.

148.   An individual claiming to be an employee at First American who identified herself as Lisa Yigit ("Yigit") responded by claiming that the fax copy of counsel's September 12 letter was illegible, so counsel promptly forwarded a new copy.  On September 14, 2011, Yigit called again and stated that another fax had not been received, and asked the document be emailed to her.  She said she knew nothing about the letter of September 12, 2011, and provided an email address.  The email address she provided was a Fund email address, which she described as her "personal" email address. Counsel then emailed the demand letter to both Fund and First American.

However, Defendants' escrow agents Arnold and First American, and Defendant Fund did not respond. There can be only one reason for the failure to respond: the Investors' moneys were disbursed from escrow.  Subsequent internet research revealed that Yigit is the contact person for one of Mattera's companies, the Mattera Reserve.

149.   Plaintiffs' counsel faxed the letter dated September 12, 2011 to First American, at 954-337-2964, which is the common fax number for Fund and First American.   On September 15, 2011, Plaintiffs' counsel emailed this letter to First American, Arnold and Fund. D.E. 7-5.

150.   In breach of their fiduciary duties to Plaintiffs, First American and Arnold did not respond.  Fund simply continued to treat Plaintiffs dishonestly.

**After Plaintiffs File this Lawsuit, First American Admits Disbursing Plaintiffs' Moneys, but Defendants Refuse to Disclose who Received the Moneys**

151.   Plaintiffs then filed this law suit.

152.   When Plaintiffs attempted to serve Arnold at First American's corporate address, the process server reported that it was a UPS box.

153.   First American, the escrow agent, was served through its registered agent, but defaulted.

**Plaintiffs' Moneys were Stolen**

154.   After First American defaulted, on October 19, 2011,  Plaintiffs sent an email to the attorneys for Mattera, van Siclen, Praetorian, Fund, and to Arnold, stating,

> It is, of course, disturbing that the escrow agent to whom our clients entrusted $4.525 million has simply disappeared and defaulted.  So, at least one party has admitted the moneys were disbursed from the escrow account.

My clients are still left with questions which should never have to be asked in an honest transaction: a) Will you confirm their moneys were disbursed?   b) Why were their moneys disbursed? c) When were their moneys disbursed? e) Who authorized the disbursal of their moneys? f) Who signed on behalf to disburse their moneys? g) To whom were their moneys disbursed? and, h) Where are their moneys or the fruits of their moneys now?

These questions can easily be cleared up if any of your clients or Mr. Arnold simply tell us what happened to our clients' moneys, and provide us with the supporting documentation.  Such disclosure would be part of any arms-length transaction.  Although the case is in litigation now, the portion of transaction related to exactly what happened to the escrowed moneys remains a mystery, so we again ask for answers to the question of where the money is.

We would appreciate a response by 5PM October 20, 2011. Absent being provided with this information, we will assume you are not going to provide it.

Exhibit 13.

155.   Unfortunately, Defendants did not respond.

156.   First American then moved to set aside the default.   Defendant Arnold filed a Verified Answer and Affirmative Defenses.

157.   In their verified pleading, Arnold and First American testified that they received Plaintiffs' moneys and that they disbursed Plaintiffs' moneys based on the instructions of Praetorian, without receiving instructions from Plaintiffs.

158.   On October 23, 2011, Plaintiffs counsel again asked Defendant First American, through counsel for what happened to Plaintiffs' moneys.  Plaintiffs asked,

"We are in receipt of First American's motion to vacate default. We sent the email below to counsel for the other parties in this case. Your answer confirms that First American disbursed our clients' moneys without instructions from them to do so, and only on the instructions of Praetorian.  Would you be so kind as to inform us who signed the instructions to distribute our client's

> moneys, and to whom to distribute them to?  Please provide us the documents reflecting same, and the instructions from both sides of your escrow. We would like all documents which established the escrow with respect to our client's moneys. Please provide this information to us by the close of business Monday, October 24, 2011."

*Id.*

159.   First American, through counsel, responded that disclosure of what First American and Arnold did with Plaintiffs' moneys was an issue for discovery.   Counsel wrote, "Please forward a proper request for the documentation you are seeking and I will attend to it in the ordinary course." *Id.*

160.   Plaintiffs' counsel replied that this was a matter related to the transaction, and was not a discovery issue.  Plaintiffs' counsel stated,

> As noted below, our request for First American and Mr. Arnold to disclose to whom it disbursed our clients' moneys was made as part of the transaction, and not as a litigation request.  Mr. Arnold's sworn testimony has now confirmed that our clients' moneys were disbursed.

> While this matter is in litigation now, the litigation arises from a transaction in which the subscription documents entitled our clients to review closing documents to determine if there were material changes in the deal before the transaction closed.  Plainly, a material part of the transaction was that our clients were entitled to proof before closing that Praetorian owned the promised Series A-1 Fisker Preferred shares.

> Our clients have never received closing documents, including evidence that Praetorian owned Series A-1 Preferred Fisker shares.   Insofar as because our clients have not received those closing documents, the transaction remains incomplete.

> Of course, we have now learned Praetorian did not own Series A-1 Preferred Fisker shares.

> Given your response, unless we hear otherwise today, we will assume that First American and Mr. Arnold are refusing disclose to our clients as an ordinary transaction matter to whom they distributed the $4.525 million which our clients wired to First American's account.

*Id.*

161.   Unfortunately, First American still refused to tell Plaintiffs to whom it distributed their moneys.

162.   In their verified pleading First American and Arnold denied they were escrow agents or Plaintiffs, and that was an escrow agent for Praetorian.   While obviously untrue, the statement illustrates that this entire transaction was a scam from the beginning and that the statements made by all of the Defendants to Plaintiffs that their moneys were even being placed in an escrow account were untrue.   Essentially, First American and Arnold would simply be a conduit for Defendants to obtain Plaintiffs' moneys, a material fact that was not disclosed to Plaintiffs by any of the Defendants.

163.   These facts lead to the inescapable conclusion that some or all of the Defendants stole these moneys; the above referenced circumstances do not allow Plaintiffs to rule out anybody.

164.   Nevertheless, the circumstances above and their prior relationships inescapably point to Mattera and Arnold as culprits of the conversion of the escrowed moneys and as recipients of the converted moneys.

165.   Plaintiffs' moneys were improperly and illegally disbursed from escrow in connection with their purchase of securities.

**The Defendants' Representations were Fraudulent**

166.   Each of the above representations was untrue and with deceitful and fraudulent intent and (as to circumstances alleged herein show) Defendants knew they were untrue when the statements were uttered; or Defendants uttered their statements with such severe recklessness as to evince an extreme departure from the standards of ordinary care, insofar as the representations presented a danger of Plaintiffs, which was either known to the Defendants or is so obvious that the Defendants must have been aware of the dangers.

167.   The statements were uttered with the intent to induce Plaintiffs to send make the investment and wire their moneys to the escrow agent.

168.   All of the above referenced statements were uttered with the intent to deceive, manipulate, or defraud Plaintiffs by inducing them to convey moneys to purchase an interest Defendants never owned, and so Defendants could steal Plaintiffs' moneys.

**Defendants' Actions Operated as a Fraud on Plaintiffs**

169.   In addition, Defendants' deceitful actions, scheme, course of business, and practices, operated as a fraud on Plaintiffs, in connection with their purchase of the indirect interests in the Fisker Series A-1 Preferred shares.

A.   As noted elsewhere herein, these actions included systematically and willfully selling indirect interest in Fisker Series A-1 Preferred shares which Praetorian did not own and setting up a phony escrow account at First American so Defendants could withdraw Plaintiffs' money from the escrow account for their own purposes.

B.  As noted elsewhere herein, these actions also included the actions of the phony escrow agents, First American and Arnold, who knowing and willfully accepted the moneys which Plaintiffs wired to them to hold in escrow, and who permitted Defendants to withdraw Plaintiffs' money from the escrow account, even though the transaction did not close and Plaintiffs never acquired the indirect interest in Fisker Series A-1 Preferred shares for which they wired their moneys.

170.   All of the above referenced actions were undertaken by Defendants with the intent to deceive, manipulate, or defraud Plaintiffs by inducing them to convey moneys to purchase an interest Defendants never owned, and so Defendants could steal Plaintiffs' moneys, or were undertaken with such severe recklessness as to evince an extreme departure from the standards of ordinary care, insofar as the Defendants' actions presented a danger of Plaintiffs, which was either known to the Defendants or was so obvious that the Defendants must have been aware of the dangers.

**The Defendants' Roles**

171.   Insofar as van Siclen was the managing member of the entity for which he was soliciting Plaintiffs' investment, van Siclen was acting on his own behalf and as an agent on behalf of Praetorian and G. Power, the entities which were held out to be the vehicle for the ownership of the Fisker shares.  As noted below, those entities turned out to be G. Power and, later, Praetorian. Thus, van Siclen plainly was "maker" of the representations to Plaintiffs.

172.   Insofar as van Siclen was also managing director for Fund, which was promoting this offering of indirect ownership of Fisker shares through shares in G.

Power (later Praetorian), van Siclen was acting as an agent on behalf of Fund, and Fund was a "maker" of the statements.

173.   Insofar as: a) the transaction was utterly a sham from day one; b) Mattera purportedly owned or controlled the Series A Preferred Fisker shares which the limited liability company would acquire; c) Mattera directly promoted the sale of interests in Praetorian and corresponding interests in Fisker shares, to Plaintiffs Masterson and Praefectus, and asked some of the Plaintiffs to find him other investors, as set forth herein; d) Mattera disseminated the Private Placement Memo;  e) Mattera controlled the distribution of the escrowed moneys and apparently received them; f) Mattera was a founding member, chairman of the Advisory Board and director of Fund, which made the statements in the Private Placement Memo; g) Mattera disseminated the Private Placement Memo, after telling Praefectus it was being typed, thereby knowingly uttering the false statements therein; h) van Siclen was Mattera's "partner" in this transaction; i) van Siclen was acting as an agent on behalf of his "partner" Mattera in promoting the sale of the Fisker shares that Mattera and van Siclen claimed that Mattera owned; j) Mattera stood to profit from this transaction and the breaking of the escrow, and apparently did so and k) for the reasons otherwise described throughout this Amended Complaint, Mattera was a "maker" of the statements to Plaintiffs.

174.   Upon information and belief (and based on the conduct described herein), Mattera, van Siclen, Hartley, Arnold and First American were all "partners" in this transaction, agents of each other, control persons, persons in authority, for purposes of statements and dealings with Plaintiffs.  As such, they were all "makers" of the verbal

statements to Plaintiffs and the statements in the offering and subscription documents, and they were co-conspirators. These facts are set forth herein, and include:

a)      Mattera publicly promotes that he is a founder and director of, and is chairman, of the Advisory Board, of the Praetorian Global Fund, Ltd, which circulated the offering documents. As such, he had authority and control over the content of the statements to Plaintiffs.  In addition, Mattera has directly, repeatedly promoted the sale of purported indirect interests in Fisker shares, to Plaintiffs Praefectus and Masterson and others, and on the internet, through memberships in Praetorian and other investment vehicles (such as XEN IX), which are used to deliver the shares. Moreover, while the transactions were pending the closing which never occurred, Mattera repeatedly reassured Plaintiffs Trust, Masterson and Prafectus that their investment was "going great," and that he was an investor just like them.  Mattera chose the escrow agent; this belief is founded on his history of using the principal of the escrow agent (John Arnold) in other deals, as Plaintiffs learned in summer 2011.  Finally, Mattera had authority over the escrowed moneys, and Mattera (upon information and belief) received the disbursed escrow moneys.

b) Van Siclen knowingly uttered the false statements described herein concerning the transaction and the ownership of the Fisker shares by Praetorian, and was the Managing Member of Praetorian and Managing Director of Fund. Van Siclen could only have learned the information he conveyed to Plaintiffs concerning the Fisker shares from Mattera.  As such, he had authority and control over the content of the statements to Plaintiffs.

c) Hartley, as a director of Fund, met with Dee Hubbard of Plaintiff Trust and discussed this transaction. Hartley later attempted to cover up Defendants' illegal and conspiratorial acts. As such, he had authority and control over the content of the statements to Plaintiffs.

d) All of their actions were as agents for Praetorian, G. Power, and Fund.

e) Insofar as the diversion of Investors' funds from escrow was an essential part of this deceitful scheme, Arnold and First American at all times and participated in the Defendants' deceitful and fraudulent scheme, and/or conspired with these Defendants by the herein referenced illegal and improper acts as escrow agents

f) Upon information and belief (as set forth below), Defendants share common employees, and have a history of engaging in similar activity.

g) In addition, after Plaintiffs wired their funds to First American, Trust demanded its money back from Mattera and Praetorian. Van Siclen responded that he would consult with his "partners." Exhibit 8.

175.  Based on Hartley's conduct to cover up the misconduct (described below) after the funds were wired, and insofar as Hartley is a director of Fund, it is believed that Hartley was also van Siclen's and Mattera's "partner," with respect to this offering and sale, a control person, a co-conspirator, and "maker" of the statements to Plaintiffs.

176.  As discussed above, Defendants used a) devices, schemes and artifices to defraud; b) made untrue statements of material fact and/or omissions of material facts necessary to make the statements not misleading; and c) and engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the

purchasers of securities, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

177.    Defendants misrepresentations and actions were a) devices, schemes and artifices to defraud; b) were untrue statements of material fact and/or omissions of material facts necessary to make the statements not misleading; and c) were acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of securities, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

178.    Defendants actions in reassuring the Plaintiffs that the transaction was proceeding normally, when the true circumstances showed everything about the transaction was a scam, were a) devices, schemes and artifices to defraud; b) were untrue statements of material fact and/or omissions of material facts necessary to make the statements not misleading; and c) were acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of securities, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

179.    Defendants acts in stealing Plaintiffs' moneys from the escrow account while Plaintiffs were waiting for the transaction to close, were devices, schemes and artifices to defraud; and were acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of securities.

180.    Plaintiffs have agreed to pay the undersigned counsel their reasonable attorney's fees.

181.    All conditions precedent to this action have been performed, excused or waived.

182.   Under these circumstances, Plaintiffs remedies at law are clearly inadequate.

**COUNT I**
**VIOLATION OF SECTION 10(b) and 10b-5(a), (b), (c)**
**OF THE SECURITIES AND EXCHANGE ACT OF 1934**
**VERSUS ALL DEFENDANTS**

183.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 182, above.

184.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, by the use of means or instrumentality of interstate commerce or of the mails, sold securities, to wit: shares representing membership interests in G. Power or Praetorian, which were supposed to provide them with an indirect interest in Series A-1 Preferred shares in Fisker allegedly owned by G. Power or Praetorian.

185.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, made, or caused to be made, the deceptive statements, as set forth above, to Investors.

186.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, were the primary and direct violators.

187.   As set forth above, the statements were false.

188.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, individually and in concert, directly and indirectly, by the use of means of instrumentalities of interstate commerce and/or of the United States mail, engaged in and participated in a continuous plan, scheme or course of conduct to deceive Plaintiffs as alleged herein, with respect to their purchase of securities.

189.   These Defendants knew or, but for their deliberate recklessness, should have known, that their statements were materially false, but made the false statements to Plaintiffs anyway.  At all times, Defendants had fraudulent intent.

190.   These Defendants had actual knowledge of the misrepresentations of material fact made to the Investors or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

191.   These Defendants' misrepresentations and/or omissions were intentional or reckless and were uttered for the purpose of enriching themselves at Plaintiffs' expense.

192.   As a result of these fraudulent, deceptive, false and misleading practices, Investors advanced the funds described in ¶ 8.

193.   Had Plaintiffs known of the materially false information or been told the truthful facts, they would not have made the investment and advanced the funds described in ¶ 8.

194.   Moreover, through their positions of control of G. Power, Praetorian and Fund, Defendants Mattera, van Siclen, Hartley, G. Power, Praetorian and Fund, was able to and did control the content of the statements disseminated to Plaintiffs.

195.   In addition to the false statements, and in furtherance of this unlawful scheme, plan and course of conduct, Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, individually and jointly took the actions set forth above.   While in possession of material information, these Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of

material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of securities, in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

196.   Each of these Defendants was a direct, necessary, and substantial participant in the common course of conduct alleged herein.

197.   These Defendants violated Section 10(b) of the Securities and Exchange Act and SEC Rule 10b-5(a), (b) and (c).

198.   Each of the Defendants was damaged by the loss of their moneys, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

WHEREFORE, Plaintiffs demand judgment against Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, rescinding the above-referenced transactions; alternatively, Plaintiffs demand judgment against Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund,  for damages, interest, costs, attorney's fees and any relief which the Court deems just.

**COUNT II
FRAUD (RESCISSION)
VERSUS ALL DEFENDANTS**

199.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 182, above.

200.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, made, or caused to be made, the statements identified, as set forth above, to Investors.

201.   As set forth above, the statements were false.

202.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, knew the statements identified were false.

203.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, made or caused to be made, the statements, with the intent of inducing Plaintiffs to invest in G. Power and Praetorian.

204.   The Investors reasonably relied on the statements uttered by Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, by investing in G. Power and/or Praetorian.

205.   The statements induced the Investors to invest in Praetorian, as set forth in ¶ 8.

206.   Plaintiffs were damaged to the extent of their investment, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

207.   Mattera's, Hartley's, van Siclen's, Arnold's, First American's, Praetorian's, G. Power's, fraudulent acts were willful, wanton, and malicious, and Plaintiffs seek punitive damages.

WHEREFORE, Plaintiffs demand judgment against Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, for rescission, for a return of the moneys invested, for punitive damages, prejudgment and post-judgment interest, the costs of this action and any other relief which the Court deems just.

## COUNT III
## FRAUD (DAMAGES)
## VERSUS ALL DEFENDANTS

208.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 181, above.

209.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, made, or caused to be made, the statements  set forth above, to Investors.

210.   As set forth above, the statements were false.

211.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, knew the statements were false.

212.   Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, made or caused to be made, the statements with the intent of inducing Plaintiffs to invest in G. Power and Praetorian.

213.   The Investors reasonably relied on the statements uttered by Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, by investing in G. Power and/or Praetorian, as set forth in ¶ 8.

214.   Plaintiffs were damaged to the extent of their investment, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

215.   Mattera's, van Siclen's Hartley's, Arnold's, First American's, Praetorian's, G. Power's, and Fund's fraudulent acts were willful, wanton, and malicious, and Plaintiffs seek punitive damages.

WHEREFORE, Plaintiffs demand judgment against Mattera, van Siclen, Hartley, Arnold, First American, G. Power, Praetorian and Fund, jointly and severally, for compensatory damages in an amount to be proved at trial; punitive damages, pre-

judgment interest, costs, an order directing the return of the escrowed moneys, and any other just and equitable relief the Court deems appropriate.

**COUNT IV**
**CONVERSION**
**VERSUS FIRST AMERICAN, ARNOLD, MATTERA,**
**VAN SICLEN, PRAETORIAN AND G. POWER**

216.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 181, above.

217.   The Investors' moneys in the First American escrow account constituted a segregated sum of money.

218.   Defendants First American and Arnold failed to account for the Investors' escrowed moneys.

219.   Defendants First American, Arnold, Praetorian, G. Power, Mattera and van Siclen converted these moneys by withdrawing the moneys from escrow for their own use or benefit.

220.   The money and property taken by Defendants were at all times the property of Investors.

221.   By withdrawing these moneys, Defendants First American, Arnold, Praetorian, G. Power, Mattera and van Siclen illegally took Plaintiffs' property.  Their actions were inconsistent with Plaintiffs' ownership of the funds and property.

222.   Plaintiffs did not consent to the acts of Defendants First American, Arnold, Praetorian, G. Power, Mattera and van Siclen.

223.   Defendants First American, Arnold, Praetorian, G. Power, Mattera and van Siclen have not returned to Plaintiffs any of the money and assets improperly taken

from Plaintiffs and Plaintiffs have been deprived of their moneys and assets indefinitely and permanently.

224.   Defendants First American's, Arnold's, Praetorian's, G. Power's, Mattera's and van Siclen's acts constitute a conversion of Plaintiffs' property, which has caused damage to Plaintiffs.

225.   First American's, Arnold's, Praetorian's, G. Power's, Mattera's and van Siclen's conversion of Plaintiffs' property was willful, wanton, and malicious, and Plaintiffs seek punitive damages.

WHEREFORE, Plaintiffs demand judgment against First American, Arnold, Praetorian, G. Power, Mattera and van Siclen, jointly and severally, for: compensatory damages in an amount to be proved at trial; punitive damages; interest; pre-judgment interest; costs; and any other relief which the Court deems appropriate.

**COUNT V**
**BREACH OF FIDUCIARY DUTIES**
**VERSUS ARNOLD AND FIRST AMERICAN**

226.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 182, above

227.   At all material times, by virtue of their acceptance of the duties of an escrow agent, Defendants Arnold and First American owed Investors the fiduciary duties of a trustee of an express trust.

228.   Defendants Arnold and First American were obligated to handle their duties as escrow agents with utmost loyalty and honesty.

229.   Pursuant to their acceptance of the duties of an escrow agent, Defendants Arnold and First American were required to comply with all instructions agreed upon by all parties, including retaining the moneys in trust pending a closing.

230.   Implicit in the acceptance of the above-referenced escrow is that Defendants Arnold and First American would account for Investors' moneys.

231.   Implicit in the acceptance of the above-referenced escrow is that if no closing occurred, Defendants Arnold and First American would return the moneys to the Investors.

232.   Implicit in the acceptance of the above-referenced escrow is that Defendants Arnold and First American would not distribute moneys from the escrow account unless proper documents were prepared transferring the Praetorian shares to Plaintiffs, and which reflected their indirect ownership of $4,525,000 Fisker Series A-1 Preferred shares, through their membership interest in Praetorian.

233.   Implicit in the acceptance of the above-referenced escrow is that Defendants Arnold and First American would follow Plaintiffs' instructions with respect to this transaction.

234.   Defendants Arnold and First American breached their fiduciary duties to the Investors when they did not account to Investors for their escrowed moneys; when, after there was no closing, Defendants Arnold and First American did not return the escrowed moneys to Plaintiffs; and/or upon information and belief, when Defendants First American and Arnold distributed the moneys without express instruction from Plaintiffs to do so and without a closing having occurred.

235.   Plaintiffs were damaged to the extent of their investment, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

236.   First American's and Arnold's breaches of their fiduciary duties were willful, wanton, and malicious, and Plaintiffs seek punitive damages.

WHEREFORE, Plaintiffs demand judgment against First American and Arnold, jointly and severally, for compensatory damages in an amount to be proved at trial; punitive damages; pre-judgment interest; costs; an order directing the return of the escrowed moneys; and any other just and equitable relief the Court deems appropriate.

**COUNT VI
CONSTRUCTIVE TRUST AND INJUNCTIVE RELIEF
VERSUS FIRST AMERICAN, ARNOLD, PRAETORIAN,
G. POWER, MATTERA, AND VAN SICLEN**

237.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 182, 217 through 225, and 227 through 234 and 236, above.

238.   As noted above, by virtue of their acceptance of the duties of an escrow agent, Defendants Arnold and First American owed Investors the fiduciary duties of a trustee of an express trust.

239.   Defendants Arnold and First American were obligated to handle their duties as escrow agents with utmost loyalty and honesty.

240.   Pursuant to their acceptance of the duties of an escrow agent, Defendants Arnold and First American were required to comply with all instructions agreed-upon by all of the parties, including retaining the moneys in trust pending a closing.

241.   Implicit in the acceptance of the above-referenced escrow is that if no closing occurred, Defendants Arnold and First American would return the moneys to the Investors.

242.   Implicit in the acceptance of the above-referenced escrow is that Defendants Arnold and First American would not distribute moneys from the escrow account unless proper documents were prepared transferring the Praetorian shares to Plaintiffs, and which reflected their indirect ownership of $4,525,000 Fisker Series A-1 Preferred Shares,  through their membership interest in Praetorian.

243.   Implicit in the acceptance of the above-referenced escrow is that Defendants Arnold and First American would follow Plaintiffs' instructions with respect to this transaction.

244.   Defendants breached these duties to the Investors when they did not account to Investors for their escrowed moneys; when, after there was no closing, Defendants Arnold and First American did not return the escrowed moneys to Plaintiffs; and/or upon information and belief, when Defendants Arnold and First American distributed the moneys without express instruction from Plaintiffs to do so and without a closing having occurred.

245.   Under these circumstances, the distribution of the moneys from the escrow account constituted a conversion of those moneys.

246.   Defendants Praetorian, G. Power, van Siclen, and Mattera all stood to profit from the breaches of fiduciary duty by Arnold and First American, and from the conversion of Plaintiffs' escrowed moneys.

247.    At all material times, Defendants Praetorian, G. Power, van Siclen, and Mattera aided and abetted, conspired in or participated in the breaches of the fiduciary duties which First American and Arnold owed the Investors with respect to the Investors' moneys, and the acts of conversion.

248.    Plaintiffs are at risk of irreparable injury and in immediate danger of significant loss or damage unless Defendants are enjoined as set forth below.  These risks include: the theft and dissipation of the diverted moneys.  Defendants will sell, transfer or dissipate their property, funds and accounts or are likely to do so; as discussed above, they have already shown their willingness to transfer moneys belonging to Investors for their own personal use and to themselves.

249.    Plaintiffs have a clear legal right to relief because Defendants took advantage of fiduciary and confidential relationships to steal and/or convert Plaintiffs' moneys and property for their benefit, in violation of law; and Plaintiffs are entitled to impose a constructive trust on the moneys these Defendants took or received, or the assets into which these moneys were transferred.

250.    Plaintiffs' remedies at law are inadequate under these facts.  Moreover, if Defendants sell, transfer or dissipate their property, funds and accounts, there will be no res from which to accord Plaintiffs relief.

251.    An injunction here will be in the public interest because it will protect the innocent Plaintiffs from the illegal actions of fiduciaries and their conspirators who took advantage of their positions to abscond with Plaintiffs' funds and will not return said funds.  Florida public policy is that stolen moneys should be returned to the owner.  On information and belief, the misconduct alleged is consistent with pattern and practice of

similar misconduct by at least Mattera, Arnold and van Siclen to fraudulently induce supposed investment in shares of corporate stock and then fail to deliver the promised ownership and instead convert the monies invested, as reflected by the allegations in the *Gardner* complaint (described above); and by Mattera's offer to sell Fisker Series B through XEN IX and other entities, with no apparent intent to deliver those shares.  In sum, an allegation to support injunctive relief on grounds that the fraud complained of here is part of a pattern of misconduct which, if not restrained, is continuing and will continue.

WHEREFORE, Plaintiffs demand judgment imposing a constructive trust over any diverted moneys or the fruits of those diversions, as described above and injunctive relief:

A.      freezing these Defendants' bank accounts to the extent of $4,525,000;

B.      enjoining Defendants from transferring, dissipating or encumbering any money, product or belonging to Plaintiffs;

C.      directing Defendants to return all moneys diverted from the First American escrow account, and deposit the moneys in the registry of the Court; and

D.      any other just and equitable relief which the Court deems appropriate.

**COUNT VII**
**BREACH OF CONTRACT (RESCISSION)**
**VERSUS PRAETORIAN**

252.      Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs1 through 182, above.

253.      As set forth above, Defendant Praetorian entered into a contract with Investors to deliver Plaintiffs' shares or membership interest "which would be

convertible into shares of [G. Power or Praetorian's] common stock ('Common Stock') in Fisker Automotive Inc."

254.  Pursuant to the contractual subscription documents, Plaintiffs "purchase[d] interests entitling member to Preferred Shares of Fisker Automotive Inc., held by The Praetorian Fund, at $2.00."

255.  Plaintiffs paid $4,525,000 for their shares/membership interest.

256.  However, Defendant Praetorian breached the above-referenced agreements insofar as it does not own the Fisker shares, does not own sufficient Fisker shares to satisfy interest representing the $4,525,000 paid by Plaintiffs and by refusing to deliver the corresponding shares representing the membership interests.

257.  Plaintiffs have rescinded the transactions.

WHEREFORE, Plaintiffs pray that this Court enter judgment for Plaintiffs against Defendant Praetorian rescinding the transaction, and returning Plaintiffs' moneys to them, plus interest on said moneys, and any other relief which the Court deems just.

**COUNT VIII**
**BREACH OF CONTRACT (DAMAGES)**
**VERSUS PRAETORIAN**

258.  Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 181, above.

259.  As set forth above, Defendant Praetorian entered into a contract with Investors to deliver Plaintiffs' shares or membership interest "which would be convertible into shares of [Praetorian's] common stock ('Common Stock') in Fisker Automotive Inc."

260.     Pursuant to the contractual subscription documents, Plaintiffs "purchase[d] interests entitling member to Preferred Shares of Fisker Automotive Inc., held by The Praetorian Fund, at $2.00."

261.     Plaintiffs paid $4,525,000 for their shares/membership interest.

262.     However, Defendant Praetorian breached the above-referenced agreements insofar as it does not own the Fisker shares, does not own sufficient Fisker shares to satisfy interest representing the $4,525,000 paid by Plaintiffs and by refusing to deliver the corresponding shares representing the membership interests.

263.     Plaintiffs were damaged by Praetorian's breach. Plaintiffs were damaged to the extent of their investment, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

WHEREFORE, Plaintiffs pray that this Court enter judgment for Plaintiffs against Defendant Praetorian for damages, interest, prejudgment interest, costs, and any other relief which the Court deems just.

### COUNT IX
### CONSPIRACY
### VERSUS ALL DEFENDANTS

264.   Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 181, and Counts I through VI, above.

265.   At all material times, Defendants conspired with each other in the foregoing acts of securities fraud, common law fraud, conversion and breaches of fiduciary duties.

266.   Each Defendant knowingly agreed to join the conspiracy by committing the above-described acts in furtherance of the conspiracy.

267.    As a direct and proximate cause of Defendants' knowing participation in these tortious acts, Plaintiffs have been damaged.

268.    Plaintiffs were damaged to the extent of their investment, the loss of the opportunity to sell securities on the secondary market, and by any potential Fisker IPO.

269.    Defendants' conspiratorial actions were willful, wanton, and malicious, and Plaintiffs seek punitive damages.

WHEREFORE, Plaintiffs demand judgment against each Defendant, jointly and severally, for compensatory damages in an amount to be proved at trial; punitive damages; pre-judgment interest; costs; and any other just and equitable relief the Court deems appropriate.

## COUNT X
## CIVIL THEFT
## (FLA. STAT. § 772.11)
## VERSUS ALL DEFENDANTS

270.    Plaintiffs incorporate by reference, re-allege and repeat each of the allegations set forth in paragraphs 1 through 182, above.

271.    As described more fully above, the Defendants misappropriated and converted monies and property belonging to Plaintiffs, by disbursing or receiving Plaintiffs' escrowed monies, which total the amounts set forth in ¶ 8, above, in violation of Fla. Stat. § 812.014.

272.    As described more fully above, the Defendants temporarily or permanently obtained money or property belonging to Plaintiffs with the intent to deprive Plaintiff of its use and enjoyment of its money or property, in violation of Fla. Stat. §812. 014.

273.   As described more fully above, the Defendants knowingly deprived Plaintiffs of their monies and property with felonious intent.

274.   Thus, the Defendants actions violated the Florida Civil Theft Statute, Fla. Stat. § 772.11.

275.   All conditions precedent to the maintenance of this action, including but not limited to delivery of a demand letters, as required by Fla. Stat. § 772.11, have been performed or waived.  That this Amended Complaint was filed prior to the expiration of the 30 days after the demand letter was delivered, is not a basis for dismissal, but this count will be dismissed if the demand is satisfied.   *See Korman v. Iglesias,* 736 F.Supp. 261, 267 (S.D.Fla.1990) (court denies dismissal for failure to send the civil theft demand and orders plaintiff to comply with the statute); *Seymour v. Adams*, 638 So.2d 1044, 1049, n. 9, (Fla. 5th DCA 1994) (failure to comply with notice statute is not grounds for dismissal so long as plaintiff complies before the statute of limitations expires); *Ames v. Provident Life and Accident Ins. Co.,* 942 F.Supp. 551, 562 n. 8 (S.D.Fla.1994) (plaintiff is permitted to make the pre-suit demand before case was set for trial); *Comcast of South Florida II v. Best Cable Supply, Inc.*, 2008 WL 190584, at *9 n. 6 (S.D.Fla. Jan. 22, 2008) (plaintiffs permitted to satisfy the written demand requirement in an amended complaint); *McCormack v. Flens*, 27 So.3d 179 (Fla. 2d DCA 2010).

276.   Plaintiffs were injured by the actions of the Defendants in that Plaintiffs have suffered direct and substantial monetary loss as a result of these thefts, of the amounts set forth in ¶ 8, above.

277.   Defendants acted with criminal intent in stealing Plaintiffs' moneys.

278.   Plaintiffs have agreed to pay its undersigned counsel its reasonable attorneys' fees for prosecuting this action.

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and severally, for:

> A.      treble the compensatory damages (identified in ¶ 8, above) sustained by Plaintiffs as a result of Defendants' theft, but not less than minimum statutory damages, pursuant to Fla. Stat. § 772.11;
>
> B.      attorneys' fees;
>
> C.      pre-judgment interest;
>
> D.      costs; and
>
> E.      any other just and equitable relief the Court deems appropriate.

Plaintiff requests a trial by jury as to those issues so triable.

Dated this 28th day of October, 2011.

> Respectfully submitted,
>
> MITRANI, RYNOR,
>   ADAMSKY & TOLAND, P.A.
> 301 Arthur Godfrey Road
> Penthouse
> Miami Beach, Florida 33140
> Tel.:   305/358-0050
> Fax:   305/358-0550
>
> By:/s/Isaac J. Mitrani
>    Isaac J. Mitrani
>    Florida Bar No. 348538
>    /s/Loren H. Cohen
>    Loren H. Cohen
>    Florida Bar No. 303879
>    Attorneys for Plaintiff

CASE NO. 11-62037-CIV-COHN-SELTZER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of October, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Isaac J. Mitrani
Isaac J. Mitrani

## SERVICE LIST

Edward Burger, as Trustee, et. al. v. Joh Hartley, et. al.,
CASE NO. 11-62037-CIV-COHN-SELTZER
United States District Court, Southern District of Florida

VIA ECF
Robert Wayne Pearce, Esq.
1499 Palmetto Park Road Suite 400
Boca Raton, Fl. 33486
Attorneys for: Bradford van Siclen
Tel. 561-338-0037
Fax 561-338-9310
Praetorian Fund, Ltd.
Praetorian G. Power, II, LLC
G. Power II, LLC

CASE NO. 11-62037-CIV-COHN-SELTZER

VIA ECF
Scott Lieberman, Esq.
Florida Bar No. 962678
Robert E. Collier, Esq.
Florid Bar. No. 854440
Rebecca Radosevich, Esq.
Florida Bar No. 91205
7390 N.W. 5th Street, Suite 10
Tel (954) 625-21233
Fax (954) 791-4480
Plantation, Florida 33317
Attorneys For: John A. Mattera

VIA ECF
Ryan Willits
Willits & Associates, P.A.
2295 N.W. Corporate Blvd. Suite 221
Boca Raton, Fl. 33431
Tel. (561) 353-2400
Fax (561) 353-2401
ryan@floridadirtlawyers.com
Attorney for First American Service Transmittals, Inc.
and John Arnold

VIA EMAIL AND MAIL
jghartley@officeliveusers.com;
johnh@thepraetorianfund.com
John Hartley
52 Beach Lane
Thompson Cove
Providenciales
Turks and Caicos Islands, BWI